We will hear argument this morning in Case 23-867, Hungary v. Simon. Mr. Glasgow? Mr. Chief Justice, and may it please the Court, Hungary and its national railway, MAV, are immune from suit under the Foreign Sovereign Immunities Act, unless the expropriation exception applies. And the key phrase in that exception is exchanged for. There is no dispute that to exchange means to give one thing in return for another. Accordingly, domestic courts have jurisdiction over this case only if some present-day asset having a commercial nexus with the United States was given in return for items taken from 14 individuals in 1944. Respondents have not even attempted to make that show. Instead, they rest their case on the theory that all fungible assets of Hungary, its agencies, and its instrumentalities were given in return for those specific items taken more than six decades before this case was filed. That's simply inconsistent with ordinary meaning. And while this case can be decided on text alone, history and context confirm the limited scope of the expropriation exception. It arose from Congressional opposition to a particular decision of this Court, the Sabatino decision, which concerned identifiable and traceable property. When Congress enacted the FSIA, it intended to codify the restrictive view of foreign sovereign immunity, not to work a radical transformation of international law. But the commingling theory would do just that. It would undermine important limits and other provisions of the statute and would require U.S. courts to decide claims having no real connection to this country. The D.C. Circuit substantively erred in adopting the commingling theory, and it committed two procedural errors. It imposed a burden of production on sovereign defendants rather than the proponents of jurisdiction, and it declined to ask whether respondents' allegations made out of valid claims of jurisdiction. The D.C. Circuit's opinion should be reversed, and this case should be dismissed. I welcome the Court's questions. And under your theory, what would respondent have to show in order to make out jurisdiction employing the commingling theory? I think there are several types of evidence that a plaintiff could use to establish an exchange even after commingling. So first, there's the type of mathematical evidence, the most obvious example being withdrawal from a commingled account that could not have occurred but for a deposit of tainted funds given the prior balance. Second, you can imagine direct evidence, instructions to an accountant to run illegal proceeds through the books of a company before depositing them into a personal account. And third, you can imagine indirect evidence. You might have an atypical deposit of a specific amount into an account followed shortly thereafter by a withdrawal in the same amount. Under those circumstances, a fact finder might be able to conclude that an exchange has occurred using ordinary meaning, but simply showing that funds entered into the general revenues of an entire nation that contained billions of dollars followed by untold numbers of transactions following that deposit simply isn't consistent with the plain text. What if the country has an account that is 95% composed of funds from appropriated property, 5% isn't? Is your argument still the same? And the entity in the United States spends less than 5% of the proceedings. I think there are close questions, but in those circumstances, maybe a fact finder could say it's at least as likely as not that tainted funds are involved and the details would matter. Temporal proximity, as I said, whether there's direct or indirect evidence, but potentially those types of claims could qualify, yes. So it doesn't matter. Commingling doesn't mean that some taint from property is funds that are not from appropriation. That can't be the entire rule. Right, we're not suggesting that commingling is fatal. In the vast majority of cases, commingling will make it impossible to trace funds. But the ultimate question is simply whether in ordinary meaning somebody would refer to the subsequent withdrawal as being exchanged for the initial deposit. And doesn't this provide a road map to any country that wants to expropriate property? In other words, just sell the property, put it into your national treasury, insulate yourself from all claims for all time? I think this court was clear in Altman that the FSIA was not intended to direct or incentivize other nations in the ordering of their affairs. Well, I was just sort of suggesting that Congress wouldn't have wanted to write a provision that has no meaning. And under your theory, I think that there would be precious little meaning to this because it really just gives foreign countries an easy way to expropriate property and make sure there's no accountability for that expropriation. I'd make three points in response. First, the FSIA doesn't make expropriation unlawful. Other forums may be available where an unlawful taking could be litigated or perhaps settled through international espousal. Second, Congress knew that these types of claims would be rare. It was informed when it passed the second Hickenlooper Amendment that it would apply to a tiny fraction of expropriation claims around the world. The Congress was attempting to overrule Sabatino not to establish a broad new type of claim that would work, again, a radical transformation of international law. And third, regardless of what this court decides in terms of the commingling theory, foreign nations can avoid U.S. courts regardless. A foreign nation could expropriate property, segregate it, and keep those proceeds out of the United States and thereby avoid the commingling theory even if it were adopted. Counsel, on that point about other forums, what about this case? Is there another forum in which the plaintiffs could pursue their claims? Yes, the parties litigated extensively whether Hungary provided an alternative forum. The District Court's 2017 decision goes through that analysis. The District Court found that Hungary was an available forum, was an available forum. The D.C. Circuit reversed that decision because it concluded that exhaustion was not required and that the District Court abused its discretion in weighing the various forum nonconvenience factors. But it didn't overturn that core finding that these claims could have been brought in Hungary. And certainly I'll acknowledge that Hungary has a European civil legal system that differs in many respects from the American system, but that doesn't make a forum unavailable. There's also the traditional method of espousal, bilateral settlement agreements. Hungary's entered into multiple such agreements, including with the United States regarding World War II-era claims. That treaty is in the record at Docket 22-5. Let me ask you a question about jurisdiction. If sovereign immunity is a jurisdictional question, how come you concede in your brief at page 43 that Hungary would bear the burden of persuasion on that point? The solicitor general doesn't think so. That's right. And we certainly don't have any objection to the court reaching the solicitor general's argument, but we didn't preserve that issue. We didn't argue it before the D.C. Circuit, and so it was unavailable for us to argue it here. Who do you think is right about that? Often in domestic sovereign immunity cases, the plaintiff bears the burden, but at least as I've explored the pre-FSIA case law, it was the foreign state that bore the burden in foreign sovereign immunity cases. Help me. I think it makes some sense for there to be some sort of initial burden on a foreign state to establish that it is a foreign. I got that, but I'm not talking about the burden of production. We're talking about the burden of persuasion. And as I read, am I wrong about that, that the pre-FSIA cases did place the burden of persuasion on the foreign entity? I don't know the answer to that question, having not made the argument. Fair enough. Okay. Thank you. Let me ask a question going back to something that the Chief Justice asked you. How do we write this? The D.C. Circuit espoused a historical commingling theory, and you want us to say that's not enough. Give me what's the affirmative thing we say so that we encompass your beginning point in response to Justice Thomas, that it's not that we're rejecting commingling. What are we rejecting? I think what the Court should reject is commingling without more. Commingling is an obstacle to establishing that an exchange has occurred. So what's the more? Is it tracing? Yeah. The parties have provided numerous synonyms for exchange. Well, but that's what I want to hear from you, which is the clearest and most succinct way to articulate the concept so that we're not saying that merely commingling is what throws you out of the courtroom. I think the rule is that to establish an exchange, the item at the beginning and the item at the end of the proposed transaction have to be given in return for one another. And I recognize that return is a synonym for exchange, and potentially more judicial gloss could be placed on the phrase. But typically when I'm saying that I give item A in return for item B, I'm saying that I gave item A for the reason that I received item B. There's some real and substantial connection between them. Now, you're not using the word tracing. Why? Trace in this context means to connect. So you have to establish a real and substantial connection at a bare minimum. Do we have to go to either of the two additional questions you presented to us? Now, the court doesn't have to address those issues. There's a number of decisional paths that are available, and perhaps the easiest one is to say that the facts as alleged here or even based upon the evidence submitted by respondents does not establish that interest payments made in 2005 were exchanged for the items taken in 1944. Certainly the other two issues are presented, and the court could reach its ultimate conclusion by way of either or both. But perhaps the easiest way to do it is to simply say that this theory fails under any standard. Mr. Glasgow, in your exchange with Justice Sotomayor, you mentioned the word tracing, but we kind of dance around that. There is a rich case law about tracing when a fiduciary takes funds. To what extent should that inform us? I think the common law doctrines regarding tracing are of limited value here because whatever— Let me just push back on that for a second. Both sides lean awful heavily on the word exchange, and you've got your dictionary, they've got theirs, so that's great. But why should we ignore that body of case law that's been developed over a very long period of time to deal with this kind of problem? Why wouldn't we assume that Congress meant to adopt or at least reference it? For two primary reasons. First, you have to look at the statutory text. We have to start with that text. And I don't think there's any real dispute about what the ordinary meaning is. Those trust law rules are not based on an ordinary meaning of exchange. And second, I think many—and it depends on which specific rules we're talking about— but many of the traditional common law rules regarding fiduciary duties, for example, are legal fictions. You'll find any number of cases describing them as such. And the jurisdiction of the federal court should not be expanded by way of legal fiction. That's simply not permissible under our structure of government. Let me return to Justice Sotomayor's question to you. What's the test? It's not tracing, you know, you said real and substantial connection, but that doesn't really seem connected to exchange. So give me something to hold on to that does bear some relationship to the text if you don't want to pull from traditional fiduciary law. I think you can use the ordinary meaning that respondents have posited, that you have to say that the item at the end of the transaction was given in return for the item at the beginning of the transaction. And that's—obviously, there are edge cases that you can imagine. But in the vast majority of cases, that's a simple test that ordinary language is fully capable of. Is it turning on intent when you say you give something for something else, like I'm intending to use the pot of money that I expropriated in order to obtain this? Is it—I don't understand how—you said it's easy in the mind run of cases to look and see, but I'm not sure why it's easy. What am I looking for? Yeah, so I think in the vast majority of cases, an exchange is simple and obvious, a swap. One person gives one thing and receives another in return. And that's the type of thing that Congress was looking at. In the Sabatino case, of course, there's the shipload of sugar given in return for a bill of lading that's negotiated for a specific and identifiable pot of cash. Those are the kind of core cases that Congress was thinking about. Certainly you can imagine more difficult cases, but this isn't one of them. I'm providing substantial connection as a bare minimum. I think that it probably is not a matter of intent. To the extent you really had to dig for additional judicial gloss, I might say it's something like causation. The reason I gave you item A is because I received item B, and vice versa. But I think that sort of deep analysis really isn't required. I guess I'm wondering why your argument hinges on exchange for. I see those words in the statute, and I could imagine a world in which they are accounted for at the moment of liquidation, that we have the property, and it's exchanged for cash, and there we are. But it would seem to me that your argument for some sort of tracing requirement comes from other language in the statute, which is the idea here, very plainly expressed, that you have to have property that is owned or is present in the United States. So we have to know that whatever was previously expropriated or exchanged still exists. The statute says it has to be owned in order to be the jurisdictional hook for. So I'm just curious as to whether or not you ever thought of it in those terms and why we care so much about exchanged. Yes, certainly that type of transaction is what Congress was getting at. And the statute is written in present tense terms. But here, respondents have alleged an indirect connection. And our argument isn't that an indirect connection can never qualify. No, but it has to be traced. I mean, my point is, in order for you to know that what is the property at issue is owned or is present, we have to find the connection between the original expropriation and what they're pointing to today. And the problem I think you're saying with the commingling theory is that unless you can make such a connection, we don't know that what is happening right now is the expropriation. Do you understand what I'm saying? And that to me doesn't have anything to do really with the word to exchange for. I think what you're getting at is the requirement of identifiable property. And you're right that if we talk about property being present somewhere or being owned in the present day, that requires you to specifically identify something in particular, not assets in general. So I think that's the important part of the statute when it comes to the requirement that some present day property be identifiable. The exchange for provides the requirement of traceability, of connecting item A and item B. I take it that the long time frame of this case then is irrelevant to you. In other words, let's suppose that this legal regime existed right after World War II ended and these plaintiffs brought their suit a year later, a year after the events occurred or two years, whatever it would have been. Same answer. I think that the time frame is relevant because it affects the number of transactions that have occurred in the interim. This is a national treasury. Presumably transactions are occurring every day and it's constantly churning. Yes, I'd agree in that context that even the passage of a year or two with thousands or millions of transactions would probably make property untraceable. And is it odd that your rule would set up a distinction between sort of two kinds of expropriated property? We had a case here a few years ago involving Nazi expropriated art, which presumably is difficult to exchange. So there you are and you just have these paintings and you don't have this Kumbling Gengishu. But suppose that another Jewish family had their wealth in diamonds and that's perfectly easy to exchange. I mean, is it weird that these cases would come out differently just depending on the nature of the expropriated property and how easy it is for a country to commingle it? No, I think that the burden a plaintiff is going to bear will always depend on the specific facts of the case. What really is at issue here is the conversion to fungible assets and in most cases, conversion to a fungible asset that's then commingled with other fungible assets will make tracing impossible. That's just the nature of the statutory language. Thank you, counsel. Justice Thomas? Justice Alito? I want to explore the question why you resist the argument that we should look to well-established tracing rules from the law of trusts in this situation. Isn't it true that the Hickam-Looper Amendment itself spoke of claims quote, based upon or traced through confiscated property? And if the intent of the FSIA was to incorporate the Hickam-Looper Amendment, isn't that a strong argument in favor of tracing? Yes, I think that when Congress passed the FSIA, it tightened that language. Exchanged for, I think, carries forward the concept of traceability because it requires a connection. But certainly if I were in respondents' shoes, I would rather be arguing based upon than exchanged for. So I think Congress did make a real effort to tighten that language. The phrase property exchanged for such property, even by legislative standards, is an awkward phrase. Congress didn't say proceeds or something similar. I'm not resisting analogies to other contexts in which tracing is required. I specifically would resist the notion that you can apply tracing rules that apply. Legal sections will presume that the ill-gotten gains were retained. Those sort of things can't be used to expand the jurisdiction of the court. Well, I recognize that the situations are quite different when you're talking about the situation that is addressed by the law of trust and the situation where a sovereign nation has a treasury with billions, trillions of dollars in it. But still, do you think that you would be in danger of losing this case if those tracing rules were applied? I don't think so, but I will say that I'm cautious given the procedural history of this case. We've been litigating this for 14 years. The case was here once before. Following the remand in Philip, the theory of the case changed from takings from Hungarians to takings from non-Hungarians. So my concern is that leaving open that sort of legal fiction theory would permit, again, another change in the theory of this case and further litigation, which effectively robs Hungary of immunity from suit. What is the total value of the property that is at issue in this case? It's not entirely clear. In the complaint, plaintiffs allege it's in excess of $5 million. There were fairly similar claims asserted in the Abolish case in the Seventh Circuit, in which the plaintiffs claimed more specifically that it would run into tens of billions of dollars. Class claims, especially with interest going back 80 years, could be so large as to be economically destabilizing, as the district court expressed. Thank you. Justice Sotomayor? Justice Kagan's questions suggest that having a viable cause of action for the victims, which I hope they do, and you explained to Justice Barrett you believe they do in Hungary, is a consideration we should have under the statute. But I take it that from your whole presentation in your briefing in this afternoon that the issue is really whether the U.S. should be that forum, correct? That's exactly right. And that the issue that when you say we're bound by the statutory language is that to have a presence in the U.S. for an act that happened in Hungary 80, 60 or 80 years ago, that the property that was taken or exchanged has to be present in the United States, correct? As to Hungary, that's correct. As to Hungary. Generally speaking, when a statute says you are required to return stolen property or any property exchanged for that stolen property, if I stole the car and sold it for $20,000 in cash, I don't have to trace where that $20,000 is. My obligation at the end of the case is pay me the $20,000. I don't care where you get it from. If you lost that $20,000 but you have another bank account with another $20,000, you still have to pay me $20,000. As a matter of substantive law, when you have a claim against a person, that's correct. When we're talking about a fungible, an item that has been rendered fungible, correct? Well, liability is in personam in a typical civil case. So you're not actually looking at any specific res under those circumstances. Here, there is a requirement that you look to specific property. That's the point, isn't it? All right. Thank you. Justice Kagan? Justice Gorsuch? Justice Jackson? Thank you, counsel. Thank you. Mr. Joshi? Mr. Chief Justice, and may it please the Court, we don't think the commingling theory is supported by the FSIA's text. It says words like that property, such property, exchange for. These call to mind specific identifiable property and transactions. And as a general matter, when you sell property and put the cash in a large, undifferentiated account with a lot of withdrawals and deposits coming in and going out, that money has lost its distinct identity as having been exchanged for the original property. And in that circumstance, you can't satisfy the FSIA's jurisdictional hook, the same as if the original property had been lost or destroyed. I think respondents' contrary view really is about tainted accounts, but the statutory text, I think, focuses on tainted property, not tainted accounts. I don't want to lose sight of the third question presented on the burden shifting. In the United States' view, that is more important than the commingling theory because it affects every FSIA case. You know, the commercial activity, tort, immovable property, and the like. This Court has often said that the party invoking federal jurisdiction bears the burden of establishing it, and Congress in Section 1330 expressly made the FSIA's exceptions jurisdictional. You put two and two together, it means that the plaintiffs should have the burden. I think my light went off. So Justice Kagan asked Petitioner whether or not this now is a road map to avoid FSIA claims by commingling or having it in a general account. It sounds as though you're willing to concede that from your opening statement, that once it's in an account like that, it's off limits to FSIA claims. Presumptively, yes. There may be unusual facts, and as my friend noted, it might be you could identify someone who says, hey, here's the proceeds from this expropriated property, please go launder it through the Treasury for a day and out. But absent something unusual like that, yes. But I don't think that that's too unusual given the statutory text. As this Court recognized in Altman, the FSIA is a jurisdictional statute. It is not intended to shape their conduct. That was this Court's words. Not intended to shape the conduct of foreign sovereigns. And sometimes that principle, as in Altman, applied neutrally, results in a plaintiff-friendly ruling. Sometimes, as here, I think it results in a defendant-friendly ruling. But I don't think it's that odd that the statute meant to be jurisdictional, and the expropriation exception in particular, intended to be recognized by this Court as a small departure from the restrictive theory of sovereign immunity, would not cover a lot of cases that are beyond where Sabatino is a touchstone would indicate that. One of the important things, I think, with making sure we don't read it too expansively is friction with other countries. And if other countries adopted a similar expropriation and commingling theory, the effects it would have on the United States. Can you explain both of those and how the United States is looking at both of those issues with respect to the issue in this case? Yeah, I think that's exactly right. We are concerned about that. Of course, I don't want to over-claim here. It's just a risk that that could happen. As this Court has observed, we are the only country that even has an expropriation exception and that would recognize these sorts of takings claims, which otherwise would be barred by traditional principles like active state and such. We think we're in conformity with international law, but it is a small departure from the restrictive theory. And if that small departure becomes what this Court called in Helmerich a radical departure, we do risk retaliatory or reciprocal actions against us. As we point out in our brief, at any given time, we face thousands of lawsuits overseas, some of which involve our commercial activities, of course. But there's no reason why, if other countries adopted an exception like this, that they wouldn't start bringing effectively takings claims in those overseas fora. And that would just multiply greatly the number of lawsuits that we would have to contend with. And this Court, I think, has said in Philip, for example, that the expropriation exception really was intended to capture Sabatino and Sabatino-like cases. So we're not saying it's got to be exactly like Sabatino, but it's got to be in the neighborhood of Sabatino. It takes quite a bit of force to overcome the inertia of non-enactment of legislation by Congress. And Congress was obviously upset enough about Sabatino to enact the Hickenlooper Amendment. And you think that what Congress thought was, wow, we're really upset about this because on these particular facts, this very unusual set of facts in that situation, there should be the possibility of a lawsuit in the United States. But in the vast majority of instances in which the property of U.S. nationals is expropriated overseas, we don't want to do anything about that. Is that plausible? Well, it was pointed out, as my friend noted, that the second Hickenlooper Amendment, as drafted, was going to cover only a very, very small fraction of expropriation claims. And remember, under the restrictive theory, no expropriation claims against a foreign sovereign can be entertained in the courts of another sovereign. So the second Hickenlooper Amendment was targeted. I mean, I wasn't alive during the events of Sabatino, but as I understand it, it was an outrage that Cuba would expropriate American-owned sugar, sell it overseas, and the money was sitting right there in New York. And under the restrictive theory, you couldn't touch it. They were upset because the sugar was in New York, and this was identifiable, but they didn't care about all the other property owned by U.S. nationals in Cuba that was expropriated. I'm totally—I don't understand your argument about retaliation. You think that if lawsuits are brought in the United States based on the expropriation, let's say, of the property of U.S. nationals abroad, then foreign countries are going to entertain suits based on the expropriation in this country of the property of their nationals? Is the United States going around expropriating the property of foreign nationals? I hope we're not, and I'm not saying that that's going to happen. I'm saying it risks its happening, and this Court has recognized that the expropriation exception is a departure from the restrictive theory, and the larger that departure becomes—it's not intended to be a big departure, but if this Court interprets it in a way that makes it a very large departure, it does risk undermining our conformity with international law. I agree with Justice Alito's question and what we think Congress wanted here. I mean, it was true that in the Sabatino case, the money was sitting in an escrow account, but Congress would not have been just as upset if instead of establishing an escrow account, Cuba had put it into a general account? I'm sure Congress would have been just as upset, but Congress is also thinking about international law and conformity with it, and I think the best way to read the second Hickenlooper Amendment and the FSIA is as reflecting that compromise. They want to address particularly egregious claims that satisfy certain criteria, which are strict, but at the same time, they want to obey international law and conformity. What do you think—a number of my colleagues have suggested that common law rules that are used particularly in the trust area, that they might have some relevance here. Suppose we said—I mean, you can tell me whether you think they should, but if they do, how would they work here? Would they actually have any effect in a case like this one where the assets are being put into a general treasury account or some big account where there are transactions all the time? It seems really hard in a case like this that any of these common law or even statutory tracing rules that have been developed in other areas of law would work, but I don't know that for sure. I will say our test— You don't know that for sure, meaning how could they work? Well, for example, there is one of the tracing theories under the statutes, under the civil and criminal forfeiture statutes. Some courts of appeals have adopted what they call a last-doubt approach, so if tainted funds are commingled with clean funds and then there are a lot of transactions, you assume that the tainted funds are the last thing to leave the account. And you can imagine why the United States sometimes likes that approach. It's because we can always find the account, and then if we need to have forfeiture, we don't need to worry about what's been spent as long as the money remains in the account. So you could think of it that way. Of course, that wouldn't help in the FSIA context because then that last doubt would leave that money in the treasury in Hungary. So some courts of appeals have adopted a first doubt. That's unlikely to help here because there have probably been so many transactions over the decades, but that's another approach. So as far as I know, there's not going to be an approach that would work here, but we would caution the court against adopting any of these approaches here. We would ask the court to leave that question open. The test that we propose for what exchange for means in answer to some of the questions here is on page 15 of our brief, whether the exchange for property retains its distinct identity. And I think that's a test that you can look at and say, was this the property actually exchanged for, or is it simply a tainted property, or is it a tainted account? And we think the statute focuses on tainted property. Thank you, counsel. With respect to the first question presented, are there significant respects in which your position departs from that of the petitioners? I don't believe so. I think we're similarly situated. Thank you. Justice Thomas? Justice Sotomayor? Do we have to reach your other two questions? I know you want us to. Yes. But do we need to? I think you do need to reach at least the third question presented on the burden shifting, because it really is, in our view, intertwined with the first question. As we point out in the last two pages of our brief, whether you accept or reject the commingling theory, the burden is going to matter. I don't know why we would in this case respondents acknowledge in their brief the practical impossibility of tracing in this particular case. So we are hoping that you need some sort of connection, or be enough in this case? It might be. I know respondents have acknowledged that. Of course, that was in a brief in opposition in which you granted cert and then by hypothesis will have ruled against them. So they wouldn't be stopped from at least attempting to make a showing with respect to particular property. And the burden might matter then. It's also going to matter for a lot of other cases, as you can appreciate. Justice Gaines? I have a hard time seeing why we'd have to answer the third question, Mr. Joshi. The petitioner hasn't disputed that it bears the burden here, number one. Number two, you make the argument, but do so on the last page of your brief, two pages. And you don't discuss any of the pre-FSIA case law that seems to suggest that the foreign sovereign bears the burden of persuasion. You just cite domestic rules, which I understand you're quite correct about. But you don't tangle with the complexity of the FSIA or its history. So why would we reach that question? So let me address each of those. I think you should reach it for... I know you want us to, but I don't see why we have to. I think you have to because, as you pointed out in your colloquy with my friend, it is jurisdictional. And this is the key difference. This is the burden of who bears the burden. And they haven't contested that they bear the burden, at least here. Now, maybe on remand they can raise that. But it hasn't been presented to us by the parties, only you. And you give us pretty thin gruel to work with. So we are word limited in our brief. We would have loved to have spent more time on it. You can always use them wisely, too. Fair point. But let me just offer this to you. Given that you grant it, sir, we think you should get the question and answer it correctly. Now, I appreciate the fact that... Do you have any response to the pre-FSIA case law?  So I think I'm not going to dispute that you're right, that that's how it might have operated before. But that's when foreign sovereign immunity was, in fact, viewed solely as a defense. As this court recognized in Helmreich, Section 1330 in the FSIA makes it jurisdiction. I know. We just haven't tangled with that yet, ever. Okay. All right. I've got it. Back to the tracing. Why wouldn't we look to common law principles of tracing in trust law, fiduciary duty law, to analyze these kinds of questions? So, again, I don't think... Do you resist that? I don't think you should reach... I know you don't want us to reach that. Yeah, that's right. All right. But I'm asking you, if we were to reach it, what's wrong with that? Do you resist that? And if so, why? There may well be principles of that kind of tracing that might work here. The only caution I would say is, one, the purposes of the FSIA and foreign sovereign immunity are different from trust law or equitable liens or criminal or civil forfeiture or money laundering or all the other examples that employ those kinds of tracing rules. So any tracing rule that might be borrowed from those contexts would have to take into account those purposes. And then the second is that international law itself has a sort of common law that has developed over the centuries, and that may have something to say about this as well. And I think those are really complicated issues that nobody has briefed, and that is why we would urge the court not to wade in on that. Sounds like good advice all around. Thank you. Well, Justice Gorsuch, if I could just push back one little bit, I think you... I think you've pushed back enough. You can push back now. Oops, sorry. Yeah, is it my turn? Justice, you can push back now and explain. You obviously want to say more about the burden issue, so have at it. The only real point I wanted to say is that if you didn't have, say, the House report and all you had was the statute, I think it would be pretty clear. In Samantar, I think this court encountered a very similar proposition. A pre-FSIA history often treated state officials and actors and individuals as partaking of the sovereign immunity, and they, too, could enjoy immunity. But in Samantar, you looked at it and you said, look, the FSIA has displaced what came before it. Although we interpret the text in light of that history, the clear text always takes precedence over whatever background rules might have applied beforehand. And the FSIA here says foreign sovereign and instrumentality. It's not defined to include individuals. Therefore, the individuals do not partake of that sovereign immunity. There might be some common law that they might be able to partake of, but not FSIA immunity under the text. And in that case, obviously, that was another instance where this principle wound up being plaintiff-friendly in that case because the defendant couldn't invoke FSIA immunity. I think in this case it would, you know, happen to work the other way. And so I think Samantar is a good example of where this court has really privileged FSIA's text over the background history and certainly over legislative history. I think Verlinden is a great example of that. There, the legislative history spoke only about American plaintiffs, American rights, violations of Americans' human rights. And yet the court looked at it in Verlinden and said, look, we know that's what the legislative history says, but the statute is not limited to domestic plaintiffs. Therefore, this foreign plaintiff is allowed to sue. Again, you're privileging the text of the FSIA where it's clear, and we think here 1330 expressly makes it jurisdictional, and that has consequences, one of which is that the party invoking jurisdiction has to bear the burden of establishing it. And you say in the brief, even if we reject commingling and require some kind of traceability, if the burden's on the sovereign to show lack of traceability, that's going to be, I think you used, a burden that could be effectively impossible for the sovereign to meet in cases like this. I think that's right, and that's certainly how the D.C. Circuit understood what it was doing in this case, and expressly said both in the decision below, I think, and definitely in its 2016 decision in this case, that petitioners would bear the burden to show a lack of tracing. And, you know, when many decades have passed, one would think that, especially given the purposes and the narrow departure from the restrictive theory that the expropriation exception is intended to effectuate, that where the property has essentially been lost, where it's lost its distinct identity, that all that means is that there isn't a U.S. forum available anymore. It doesn't let the sovereign off the hook. It just means there's not a forum here to hear those claims, and it would be, I think, quite perverse to flip it around and say as soon as it's lost its distinct identity, at that point, when nobody can prove it one way or the other, at that point, U.S. courts are wide open to hear these claims. And you said earlier you think that this is all in compliance with international law, but it's got to be at the outer boundaries of that, right? I mean, extending this further would seem to really push us into noncompliance with international norms and law, I would think. It would seriously risk undermining our conformity with international law. It's a point this court recognized in Helmerick and Philip, and I think it applies here as well. And then last, Justice Alito asked a question about suits against the United States. I assume those would be backward-looking suits for things that happened long ago. I would assume so, yeah. Thank you. Justice Barrett? Mr. Joshi, I want to ask you about the word exchange. So the statute says any property exchanged for such property is present in the United States. And you agree, everyone agrees, that this doesn't apply to just the first transaction. And I want to preface this by saying that this isn't a hostile question. I'm really just asking because I want to understand it. And I understand the good reasons for that. Sort of like everyone says, well, of course it has to, because otherwise it would be impossible or foreign sovereigns could evade jurisdiction in the United States. But just how do I think about the word exchange then? Because I was thinking about it as we're sitting here, as I was reading the briefs. I mean, let's imagine that I steal Justice Gorsuch's car. Purely hypothetical. And I take the car and I sell it for the cash. Well, I've made that exchange, and so that clearly, under the ordinary meaning of the word, qualifies, right? Then I take the cash and I buy a painting. I bet on the right painter. It appreciates in value. Twenty years later, I sell it, and then I buy a beach house. Would we really say that I've exchanged Justice Gorsuch's car for the beach house? Maybe, maybe not. I think it might be fair to say that you exchanged $20,000 worth of that beach house for the car. And I gather respondents here are seeking only as much as the value of the property. Well, let me clarify. In this hypothetical world, we're not talking about commingling any of my own cash. Let's just say it's all just one-to-one. Because what I'm thinking about and what I'm trying to figure out is why any of that is an exchange once we go beyond the first step. You're right, and I think it would be reasonable, and it's certainly a reasonable definition of exchange, to think that it's just the first step and not the second or third or subsequent steps. I think we believe that Congress, at least, it may not cover infinite steps, but we believe it covers more than one simply because of Sabatino. In Sabatino, the sugar was taken, it was sold overseas, I think, in Europe, and then the money was given to a broker. That money then changed hands to a corporation, which went to a receiver, which eventually went to an escrow account. And you might say, well, it's the same cash, but probably it was cash exchanged for notes, exchanged for other kinds of transfers or site drafts or something like that. And so I think because Sabatino involved arguably multiple exchanges, we think it's best to read this as also involving multiple exchanges. That's the same reason why property exchange for property in a lot of areas of the law doesn't include sales. But we think because Sabatino involved a sale, that Congress probably meant this to involve sales as well. But at the same time, we shouldn't go much beyond Sabatino, which really is the touchstone, and this court has recognized it, and I think all parties sort of recognize that. That is the touchstone of claims Congress was trying to reach. And so we do think it's important to adopt the right definitions, and those definitions in this context are narrow. We just don't think they are the narrowest ones you could read. We're just trying to get the right definition in context, given the background of this case. So but for Sabatino, you would say, well, maybe that is the best meaning of the words, that you're just looking at the exchange and not the continual changes down the line. We might well say that. I mean, there is a Bramski, which I know has not been the greatest precedent to cite sometimes, but that does say that even when you've got a sale, a straw purchaser does invitiate the fact that the first person is sold to the third person. And so there might be some sort of principle like that that might apply here. I don't know. But we think, given Sabatino and the history, that it does encompass at least more than one, maybe not as many as Your Honor suggested in a long chain of transactions. Okay. Thank you. Justice Jackson? Justice Barrett's hypothetical and questions make me, again, wonder whether exchange is really the term that's doing the work here and whether you need it at all to make the argument that I thought you were making. I see your argument as being that property that has been commingled to the extent that it no longer retains its identifiable nature doesn't satisfy the statute because the statute requires property that is owned or is present as the jurisdictional hook. And so if it's been commingled and we don't identify it anymore as what it was when it was expropriated, we can't know, I thought you said, whether or not it is owned or is present. That sort of conceptualization of this doesn't hinge on the exchange. And, in fact, the exchange could have happened way back at step one. It's now liquidated, and it's the liquidation that makes it comminglable such that it loses its identity. But that's all exchange does for us. I don't understand this to be an argument that relies on a definition of exchange, really. So I would certainly love to agree with you, but I think, in fairness, both of them do some work here. So as far as the is goes, my understanding of Respondent's claim is that there is actual money here in the United States from which Hungary, the sovereign, made the bond payments. And so they point to that money and they say, that's owned by Hungary. It literally is here present in the United States in connection with Hungary's commercial activity. So then you say, well, what is that money? Was that money actually exchanged for the goods that were taken from the survivors? I don't know why you asked that question. Why isn't it just, can you trace that money back to the beginning? How it got here, whether it was exchanged one-to-one or whatever, it doesn't seem to me to be doing the work. It's just, what you're pointing to today, can you trace it to what happened 75 years ago, right? But the statute doesn't say trace, right? It says either the expropriated property, it says that property, or any property exchanged for such property. Such refers back to that, to the property that was taken. They go liquidation on day one, right? They take the property, they sell it. We have money. And that would qualify as any property exchanged for such property.  First step, exchange for. So then the money goes into either a separate account or a commingled account. And then once it's in a commingled account, I understood the United States' argument to be that unless you can trace it, Maybe I'm wrong. Trace it to the money they're pointing to today, you don't satisfy the statute. That's basically right. I mean, once that cash is in a large account and there's lots of deposits and withdrawals, it loses its distinct identity. Right. And at that point, then, no property, whether it's in the United States or not, could be deemed to have been exchanged for the original property. It's as if the original property had been lost or destroyed. Thank you. I mean, I guess my only point is if the original property is lost or destroyed, the exchange was still made originally. We identified the exchange, and then it's lost or destroyed. The problem is we can't trace it to what you're pointing to today. Right? I think we're saying the same thing. I think they're equivalent, but the notion of tracing has to come from the word exchange for. I think that's the way to get there.  Thank you, counsel. Mr. Dorofsky? Mr. Chief Justice, and may it please the Court, Hungary and MAV lack immunity for stealing respondents' property during the Holocaust. First, the expropriation exception applies when a foreign state or instrumentality possesses the expropriated property or any property exchanged for such property with the required commercial nexus with the U.S. Hungary and MAV stole respondents' property while forcing them onto cattle cars. When Hungary and MAV liquidated respondents' property, they exchanged that property for money. And when money is commingled, a withdrawal from commingled funds is an exchange for earlier deposits. So when Hungary used commingled funds to pay interest and buy equipment in the United States, it put into the United States property that had been exchanged for the expropriated property. For MAV and instrumentality, the analysis is even simpler. The property doesn't have to be in the U.S. MAV deposited money exchanged for respondents' property into funds it continues to hold, and that satisfies the exception given MAV's commercial activity here. Second, Hungary would nullify the expropriation exception by limiting it to barter economies and inept regimes, hardly the threats that Congress targeted. The expropriation exception is already limited because it requires that the taking violate the international law of expropriation, which doesn't reach domestic takings. Moreover, this case is the rare case where the historical record shows the defendant's practice of liquidating and commingling. I'd like to briefly address the two tests that I heard Mr. Joshi and Mr. Glasgow propose. The government proposes a test whether property retains its distinct identity. But because money is fungible, as soon as it is commingled, at that point it loses its distinct identity. So under the government's test, commingling would be a roadmap for escaping the FSIA's jurisdictional hook. Mr. Glasgow argued the item at the beginning and the end have to be given in return for one another. That's exactly what happens when you have a series of exchanges involving money. I welcome the court's questions. You know, that's understandable. But if the account is one for one, you reduce the property to funds and you hold that fund into a marked account, that's understandable. But when you put the funds in an undifferentiated or general account, how do you say that the funds in that account are all exchanged for the property? Justice Thomas, I think the answer to that has to do with the fungibility of money. When somebody deposits money in a bank, they get an IOU, in effect, a credit. A withdrawal is then an exchange of that IOU for money in the bank. But they're not getting the same money. They're not getting the same bills. The money has worked its way through the banking system. The bank has lent it, has used it, has done whatever with it. But they're getting money back for the IOU. The account always has more money in it than it would have had but for that initial exchange, setting aside the possibility of bankruptcy or the account zeroing out somehow. The account always has more money in it and, therefore, when there's a withdrawal later in time, that withdrawal can be understood as being in exchange for the expropriated funds that were put in in the first place. But the funds are not simply from that exchange. You could have Justice Barrett's funds from Justice Gorsuch's car. You could have people's retirement accounts in that general fund. And the funds from the property. So it's not merely the exchanged property, funds from the exchanged property. That is, of course, the nature of commingling, that when you put the expropriated funds in with other funds, you have both there. But because the funds don't have a distinct identity, because money is fungible, when you take the money out, it is perfectly natural to understand that you are taking out funds that are attributable to the funds that were there before. How would you distinguish an account that is solely, let's say that someone, Hungary, set up an account, stolen prune account, and you could trace it, how would that be different from a general account? I do think that if you had a segregated account, if you had a Holocaust theft fund account, that was totally segregated from any other general funds that the defendant had, that would be a different situation. You'd be able to say those funds are just in this one place. But as soon as they are commingled, at that point, you can no longer differentiate the illicit funds from the funds that were there before. And the law recognizes this in a number of different areas. This is why, for example, in the in-rem cases, in a civil asset forfeiture proceeding, a district court doesn't lose in-rem jurisdiction just because forfeited money is deposited in a bank, enters the banking system, and in a sense, leaves the jurisdiction where the money was seized. In the money laundering cases, as the Fourth Circuit, for example, recognized in the Moore case, that's talking about monetary transactions and criminally derived property. The government doesn't bear the burden to prove that no untainted funds were used after illicit funds are commingled with other funds. At the end of the day, you're really just asking us to throw out the general rule that sovereigns can't be sued for appropriations of this sort, right? I mean, once you say commingling counts, well, then everything's pretty much fair game, except for the rare possibility that they happen to have an account that's appropriated funds in a particular instance. It seems to me that, is there anything wrong with that? In other words, we know that from Sabatino and the second Tickenlooper Amendment, that Congress had in mind a much narrower exception than that. Other than curious and bizarre situations of accounting, like the one when they have a separate account for appropriated property, this is really just throwing out the whole sovereign immunity principles under which the rest of the world operates. I don't think that's quite right, Mr. Chief Justice. Congress passed the expropriation exception over the executive's opposition, knowing that that was a departure from international law. It did so in response to Sabatino, but the language that it passed wasn't limited to the facts of Sabatino. Congress enacted broad language. Sabatino itself involved fungible property. The court there recognized traceability problems. Congress knew that, but enacted the broad language anyway. I'm sorry to interrupt, but it seems to me you're just agreeing with me that that's what will happen under your theory. No, I also think there are significant guardrails to our theory. One is the guardrail that this court put up in Phillips in interpreting the expropriation exception, requiring that you're only talking about domestic takings. I'm sorry, the domestic takings rule applies, and so a foreign country can't be sued for takings from its own citizens. That's already one limitation. In addition to that, though, plaintiffs actually have to be able to show liquidation and commingling. Usually, when somebody's property is stolen, at that point they don't know what happened to it. This is the rare case, the Holocaust is the rare case, where there is extensive documentation of what Hungary's practice was, and we put that documentation before the district court. Hungary did not rebut it. That's why the district court relied on three key sources that we put in. The Hungarian Constitutional Court decision from 1993, a manuscript about the Holocaust in Hungary written by one of Hungary's own experts, and archives from the U.S. Holocaust Museum. All three of those sources established that Hungary had a practice of not just expropriating, but then also liquidating the property, melting it down, commingling it with state funds, including in the country's general accounts. Do you think in most cases that the appropriated property is not commingled with the general funds? It would have to be established. Again, typically a plaintiff is not going to know that. This is a case where, because the Holocaust is a unique situation, where we actually do have documentation. A plaintiff can't just go into court and say, my property was taken, I have no idea what happened to it, but I think it was probably commingled, so therefore the sovereign immunity doesn't apply. The example you gave, Mr. Dvoretsky, you said unless a country were stupid enough to establish a Holocaust expropriation fund, but I'm wondering whether even if a country did establish a Holocaust expropriation fund, whether that would be good enough under the petitioner's theory, because there were 500,000 victims of the Hungarian Holocaust, so there was a lot of money from different people going into that fund. So that's all commingled. So even in that case, it seems, the petitioner would say the country is off the hook. So again, I think there's no reason to think that Hungary actually had this kind of a Holocaust death fund. Yes, I know, it's an example to sort of suggest, I mean, a country's never going to pay, under the expropriation exception, which Congress passed, presumably, to do something. Even if a country set up an expropriation fund, all that money is commingled too. Right, it's certainly commingled with the country's overall asset base. Even if it's not. Counsel, can I ask you, because I guess I'm still stuck on whether or not the tracing requirement is inherent in the nature of the nexus that is necessary for jurisdiction here. So let me ask you a hypothetical. Suppose Hungary obtained expropriated art, and then it brought it into its museum somewhere, and then lost track of it. Lost it. We just can't find it. It never sold it, it never exchanged it, it just disappeared. Would there be jurisdiction to sue under this statute, in your view? So I think we have to distinguish under the statute between Hungary and the instrumentality. For the instrumentality, the nexus requirement does not require that the property be present in the United States. The instrumentality has to have the property or property exchanged for it, and it has to engage in commercial activity in the United States. In your hypothetical, where we don't know, however, that either the instrumentality or the country still even has the property, if that can't be established, then I think the expropriation exception probably would not be satisfied. And it's because the property, as far as we know in terms of facts on the ground right now, doesn't exist. It's not present. It isn't there. So that suggests to me that this really is about identifiable property that is presently either in the United States or with the foreign instrumentality that is doing work with the United States, right? I do think for the instrumentality question it would be tricky, because the statutory language talks about the property being owned by an agency or instrumentality. I can own things and not know where they are. You can own something and lose it. Yeah, but someone would have to establish that it is still owned by you, right? That it still exists, correct? We have to know where it is in order to determine. We have to know what it is, right? Or that you own it. I suppose you could have a situation where I have title to something, but I don't know where the thing is that I have title to. You would say that I still own the lost item. I guess that's a step removed from your hypothetical. I guess what I'm trying to figure out is whether or not you are reading this as a statute that allows for suit against any foreign country that previously expropriated, whether we can figure out where that particular property is or not. And I don't see it as that, and I'm worried about that. So I don't think it's that, and again, I don't think that's this case. No, it's not this case, but don't we have to have some means of determining where this thing is in order to satisfy the nexus requirement of this statute? Because other than that, you would have a situation in which all that needed to be proved, I guess, is that at one point, 75 years ago, this property was taken by this country, and there we are. Unless you can show that it is in the United States or is owned by the foreign state today, I don't know how you satisfy this jurisdictional hook, and I don't know how you prove that without some sort of tracing. So I think you do have to show that it is either in the United States or is owned today by the instrumentality. I think that comes from the statute. As for tracing, I think in the context of money, which again is fungible, whatever tracing requirement there might be is satisfied by the very fact of commingling. And this takes me back to some of the early discussion with the Chief Justice and with Justice Thomas. So you're saying that every dollar for 75 years that was in the bank accounts of Hungary counts for the purpose of knowing that that's where this money is? For purposes of establishing the jurisdictional hook, yes. And that is again because Hungary's bank accounts were increased by X dollars of value as a result of the expropriated property being put in there. Hungary therefore has that much more... that it went in, was commingled with the other art. We can't exactly figure out which one it is or we don't know. You would say no jurisdiction. We have to know that they have the painting. There it is, right? Again, I think that's different in two respects. One is that the painting's not fungible, so you've got to identify that particular painting. Dollars are fungible. It doesn't matter whether I give you $10 or whether I give you two fives. It's the same thing. That's one distinction. The other distinction is, again, it's an unusual situation that you're positing, Justice Jackson, because the painting goes into the art museum. Let's say we have security cameras around the art museum. We know it never left. Nobody ever took it out. But we can't find it in the museum. I don't know. It's behind a couch somewhere. It's in the basement. Would you say that it is still there? I think you would, but again, that's far removed from this case where we're dealing with fungible property, and the key point is once the money is commingled, we know that it's there because the account value is increased by the amount of that money. Can I ask about the foreign policy implications? Because I think we need to account for those. No other country in the world has an expropriation exception to begin with, right? That's right, and Congress was aware of that when it passed this one. But doesn't that fact and the out-of-compliance with international law, suppose we have a choice, you can interpret the exception more narrowly or more broadly, more broadly pushes us further out of compliance with international law, this is what the Solicitor General says, furthers friction with foreign countries, because we can forget it's a big deal to hail a foreign country in a U.S. court, and also increases the risk of reciprocal actions against the United States and foreign countries abroad. So do we assume Congress meant to do all that, or is it, as the Solicitor General says, more prudent to choose the narrower interpretation of it so as not to cause all those ramifications? So two points, Justice Kavanaugh. One, I think you should assume that Congress intended to do something when it passed the expropriation exception, and as Justice Kagan's question... But even just doing the narrow Sabatino is doing something. It's doing very, very little. Okay, but it's something. And they said, and they recognized that it was narrow, that it was recognized at the time. And keep going. Well, I think you may be referring to the Katzenbach legislative history testimony, which I'm happy to address, but if I could also just finish the point to your earlier question. Keep going, yeah. In addition to giving this exception some meaning, it is already a narrow exception in light of Phillips. That already significantly cuts down the class of claims that can be brought. And again, as I was saying earlier, you have to actually establish commingling and liquidation, which is not something that you're typically going to be able to do. So these are not claims that can be easily brought, but this is the rare case in which they can. With respect to what Congress knew when it was passing the Hickenlooper Amendment, I think, Justice Kavanaugh, that you were referring to the Katzenbach testimony. The Katzenbach testimony first was against the amendment. The executive opposed even what it potentially viewed as a narrow expropriation exception. But beyond that, so there's a figure in the legislative history in which Katzenbach said only 1% of expropriated money would be at stake. That was based on there having been 19 lawsuits on an expropriation theory. That's actually a surprisingly high number, given that there was no expropriation exception at the time. And Katzenbach took the dollar value of those lawsuits, divided by an estimate of the total amount of expropriated money from U.S. citizens, and came up with that 1% figure. That doesn't tell us what the scope of this exception in the language that Congress actually enacted is doing. There were some questions that came up earlier about tracing, and whether that is a body of law to look to here. I don't think it is, but I think even if you do, first of all, the general rule in St. Louis v. Spiller is that, quote, So the equitable rule actually did allow, even in the commingling situation, for liability to be established. Beyond that, though, the equitable rules as... Would you repeat that again? Sure. This is from St. Louis v. Spiller. When, quote, upon the mingled mass to the extent of his contribution thereto. And so even... Thank you, counsel. Even in the trust fund, the general rule is that when there are commingled funds, there can be liability still established. Commingling doesn't defeat that. But isn't that about liability again? So that's kind of going back, maybe it was Justice Thomas before, I can't remember who, but is there a difference between jurisdiction and liability? Because I don't think anybody would deny that Hungary, even if it commingled all these funds, still would owe the money. But the question here is a little bit different, right? Is the money present for jurisdictional purposes? Does that bear on the question? So my fundamental point would be, I don't think that the tracing rules should apply here. If you did look at them, then you should look at them through the lens of that language that I was quoting from Spiller. But the reason I think the tracing rules don't apply here, those are really rules that come out of equity cases. So when this, not to turn this into an ERISA case, but in ERISA, Congress specifically said in Section 502A3, it referred to equitable relief. And so in cases like Great West and Saraboff and Montanil, this court had to delve in to these archaic distinctions in equity about what kind of tracing was required in particular circumstances. That's not what Congress did when it passed this jurisdictional provision in the FSIA, which codifies the common law. The FSIA comes from common law. We know that from cases like Samantar. And so Congress wasn't invoking these equitable principles in the FSIA. The tracing rules don't provide the answer here. Mr. Durresca, can I ask you just a question about other cases in this area? So we have the Second Circuit case and the D.C. Circuit case on this question. Has this commingling theory been used under the expropriation exception before and other cases besides the two that created the split here? Not that I'm aware. So in terms of the foreign relations consequences of reading the expropriation exception our way, there has not been a flood of cases that have been brought. I'm not aware of other cases besides those two and some other Holocaust litigations. If we accept the plaintiff's theory or a petitioner's theory or the government's theory, at least the government said there's no difference between the two. If we say, and I'm not suggesting you're losing, just a hypothetical, okay? If we say that the historical commingling theory is not enough, that you need in some way to identify the property, does your complaint survive? Or do we just reverse and order dismissal? So our complaint survives. And we do have to reach the who bears the burden of proof, correct? Well, I don't think you do on this record because of the evidence that we have already put in that Hungary has not tried to refute. That's my whole point. It is very hard to imagine if I have a bank account that I put $100 in it today and after 80 years, I'm not quite 80, I'm 70, but after 70 years that that same 100 remains in that account under any theory. Every passing year I have a flood of money going out, I have a flood of money coming in. It's an interesting concept that that $100 that my mother put in that account the day I was born, that a piece of it is still there 60 years or 70 years or 80 years later. It's a fiction that takes quite an imagination. So two points, Justice Sotomayor. One, Hungary could have tried to refute but didn't liquidation and commingling in the first place. They didn't dispute that and that is something that a foreign sovereign could disagree. Let's assume that they took that $5 billion and put it in. What they came in and said, you can't trace that money now, there's been so much money that's come in and gone out over 80 years. There's no way to say that any of that remains. Let me try this. Not quite 80 years, but I think that if I had not been a summer associate during law school, if I had chosen to take the summer off, I would have deposited less money back then and as a result I would have less money in my bank accounts today. Now you could say, oh no, you spent your summer associate salary on tuition, that's gone. So let's get to the bottom line. You're saying to me that we have to, that this case, the end of this case, depends on us reaching the question of the burden of who bears the burden of pleading this. I don't think it does. First, if the commingling theory is valid, as we argue that it is. I gave you a different hypothetical. If the commingling theory is not valid, do you need to reach the burden shifting? At that point, I would still say that you don't because of the unrebutted facts in this record. But if you do reach the burden shifting argument, the burden of persuasion there ought to be on the defendant, on the foreign state. Yes, this court has referred to foreign sovereign immunity as jurisdictional, but it's an odd kind of jurisdictional inquiry. Subject matter jurisdiction generally can't be waived by statute. Subject matter jurisdiction here can be waived. As a matter of litigation strategy, Hungary has, as Justice Gorsuch pointed out, Hungary has said that it bears the burden of persuasion. And Hungary in this situation is the party with superior access to the information. It has extensive records of what it did with expropriated property. Mr. Dabrowski, you don't dispute, though, that you bear the burden of production at this stage of showing an exchange, correct? Correct. So whatever that standard is, you acknowledge that you bear the burden of production to meet it? Once they dispute our factual allegations as to that, yes. Then the burden shifts to us in order to show that, in fact, our property— And they say under a proper standard there is no exchange here, and under their standard you'd have to meet that if the court were to adopt their view of what an exchange means. I think that's right. Okay. So really the burden of persuasion question isn't before us in that sense. It's really who bears the burden of—what the burden of persuasion— sorry, the burden of production is with respect to an exchange. Right, and I think that's often true in burden cases. At the end of the day, once you have both sides' evidence in the case, unless it is perfectly in equipoise, which it very rarely will be, the court is just going to weigh the two sides' evidence and decide by a preponderance who's right. Does the case die, though? Let's just follow Justice Sotomayor's hypothetical just hypothetical. Let's imagine that we adopted the United States' view. Would you have any hope of satisfying your burden of production on remand? We would, and I would think that we would be able to get jurisdictional discovery into that inquiry if that were the standard that the court were to adopt here. The way this case proceeded below, again, Hungary's only argument— Hungary didn't dispute expropriation, and it didn't make an argument about the fact of liquidation or commingling. It only said, well, it's impossible to trace, and the way this case was litigated was about whether there was a tracing requirement. If this court concludes that Hungary's or the United States' standard is the correct one, and again, Hungary has the information about what happened to the property and about its bank accounts, we would at that point be entitled to jurisdictional discovery below to try to establish whatever standard this court set. What would that jurisdictional discovery look like? For starters, it would involve discovery into Hungary's records of what happened in the Holocaust. We allege at some length in our complaint that Hungary has extensive records of the expropriation of property and what happened to it after it was expropriated. We would want to get access to those records, which we have tried to get but been unsuccessful. I don't understand how that would help you. I mean, they have records, and they say, yes, we took all of these people's money and other assets, and the money we put in bank accounts, and the assets we sold, and we put the proceeds in bank accounts, and then we spent it. I mean, that's what you're going to find out 70 years later, right? Well, and Justice Kagan, the records are actually, I think, a little bit more detailed than that. We already know and have put in the record evidence of particular bank accounts that the money was deposited into. And so if this court were to require us to somehow trace the flow of that dollar from 1944 to today, we would need that kind of evidence to know this property was deposited into this bank account and then trace the flow of that bank account through the years. I don't think that is the standard that the statutory language requires because, again, I think the commingling theory is valid. Money is fungible. All the arguments we've been talking about about the nature of exchange in this context. But if the court were to disagree, we'd be entitled to discovery to try to figure out exactly where the dollar went from account to account. Unless the account into which the money was placed was the sort of unlikely special account that was discussed earlier, the Holocaust expropriation account, I don't understand how that kind of discovery you're talking about would help you. I think it depends what standard the court were to adopt. Again, I think the right standard here would not require this sort of tracing because when we're talking about money, it just doesn't make sense to ask where a particular dollar went when all dollars are fungible. But if the court were to come up with that kind of a standard, we ought to be entitled to an opportunity to prove it. Just one thing, in that discovery, are you deposing officials from Hungarian government too? Potentially, yes. Just one clarification. Is the exchange in your argument at the point of the liquidation or the withdrawal? At some point you were saying withdrawal is when the exchange is occurring. Both. Both. There are multiple exchanges that occur in the chain. Thanks. Thank you, counsel. Thank you, Your Honor. I'd like to make just three brief points. First, jurisdictional discovery did occur in this case back in the summer of 2019. We submitted declarations explaining the tracing was impossible. The respondents engaged in some discovery. The district court imposed a deadline to file a motion to compel and they elected not to do so. Second, there were some questions about what specifically outraged Congress in Sabatino, and there's some historical context necessary to understand that. At the time Sabatino, the second Hickenlooper Amendment was passed, prior to the FSIA, Congress presumed that assets would be in the United States for such a claim to proceed because there was no mechanism to establish in personam jurisdiction over foreign states. And so some asset had to be present in the jurisdiction of the district court in order to proceed with those claims. And the sort of catchphrase that Senator Hickenlooper used during those debates was the United States would become a thieves market unless the second Hickenlooper Amendment was passed. And then finally, I know the parties have made a number of analogies in this case and I recognize no analogy is perfectly apt, but if I can offer one more, hewing as closely as I can to the facts of this case. Imagine that a trial court in a European capital city declared that it had the authority to adjudicate claims for the internment of Japanese Americans during World War II. Claims that could result in a judgment against the United States in the billions of dollars and permit attachment of U.S. property abroad. And imagine further that this trial court based that authority on the proposition that every dollar the United States spent in the past 80 years was given in return for personal property taken from a few interned individuals. The United States would be outraged and affronted by such a decision. When Congress passed the FSIA, it knew that exercising jurisdiction over foreign sovereigns creates international friction. That's why it focused on commercial activities consistent with the restricted view of foreign sovereign immunity. And that's why it imposed a commercial nexus requirement in the expropriation exception. The commingling theory effectively reads that most important part of the exception out of the statute. We ask that this court reverse. Thank you. Thank you, counsel. The case is submitted.